.

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES W. EDGAR,                           Civ. No. 09-6376-AA

        Plaintiff,                        OPINION AND ORDER

    v.

UNITED STATES and DEBORAH
SCHMIDT,

        Defendants.
_____

James L. Buchal
Murphy & Buchal LLP
2000 S.W. First Ave., Suite 420
Portland, OR 97201
     Attorney for plaintiff

Kevin Danielson
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204
     Attorney for defendants

1    - OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiff James Edgar filed suit against the United States and United States Forest Service District Ranger Deborah Schmidt alleging conversion and violations of his procedural and substantive due process rights under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Plaintiff's claims arise from the demolition and removal of several mining structures from plaintiff's mining claim. Defendants now move for summary judgment, arguing that Bivens liability is not warranted in these circumstances and that plaintiff cannot establish the elements of conversion. Plaintiff filed a cross-motion for summary judgment seeking to hold defendants liable for the destruction of his property. Defendants' motions are denied, and plaintiff's motion is granted with respect to his procedural due process claim and denied with respect to his substantive due process and conversion claims.

## BACKGROUND

Plaintiff owns a mining claim in the Umpqua National Forest called the Bird's Nest claim. The Forest Service requires an approved plan of operations to pursue mining activities that may cause a disturbance of forest lands. 36 C.F.R. § 228.4. The Forest Service also requires a reclamation bond to ensure that the land is "reclaimed" to its prior condition once mining operations are abandoned or otherwise cease. Id. § 228.13.

2 - OPINION AND ORDER

In April 1991, the Forest Service approved plaintiff's plan of operations for the Bird's Nest claim. Under his plan of operations, plaintiff agreed to post a bond for the "removal [of structures and improvements] and reclamation of the site upon abandonment and/or termination of mining activities." Schmidt Decl. Ex. 1 at 9. Plaintiff also agreed, within thirty days of "termination of operations, sale or abandonment of [the] claim," to remove "all equipment, structures and refuse that are not authorized by this operating plan to encumber the mining claim during periods when no mining is being conducted." Schmidt Decl. Ex. 1 at 8. At the time, plaintiff's reclamation bond was $851.00.

The Forest Service subsequently extended plaintiff's plan of operations until May 23, 2000. As of May 2000, plaintiff had built four structures on the site: a mill, a generator shed, a bunkhouse, and an outhouse. Plaintiff built the structures to facilitate his mining operations and received authorization from the Forest Service to do so.

In July 2001, plaintiff submitted a new plan of operations. According to defendants, approval for the new plan was delayed for several years after third parties appealed related decisions of the Forest Service. Schmidt Decl. ¶ 7. It is unclear from the record whether plaintiff pursued mining operations during this time, though defendants make no allegation that plaintiff conducted unauthorized mining activities.

3    - OPINION AND ORDER

In January 2007, plaintiff submitted a revised plan of operations. Schmidt, the District Ranger for the Cottage Grove Ranger District, informed plaintiff that she was willing to approve his new plan of operations with some additions, and that she would like to discuss the amount of the reclamation bond. Schmidt Decl. Ex. 1 at 56-57. Plaintiff and Schmidt subsequently exchanged correspondence and met in person regarding the bond amount.

On March 12, 2007, Schmidt indicated approval of plaintiff's new plan of operations with an increased bond of $4,106.07. Schmidt provided plaintiff with the calculations and reasons for the increased bond amount and notified plaintiff of his appeal rights. Schmidt Decl. Ex. 1 at 58-60.

On April 11, 2007, plaintiff appealed Schmidt's bond decision to the Forest Supervisor and explained his reasons for protesting the bond amount. Schmidt Decl. Ex. 1 at 62-64.

On June 4, 2007, the Forest Supervisor denied plaintiff's appeal, and plaintiff appealed the Forest Supervisor's decision to the Regional Forester. On October 18, 2007, his appeal to the Regional Forester was denied.

On November 21, 2007, Schmidt notified plaintiff that he must submit the new reclamation bond by January 11, 2008, and if he failed to do so, plaintiff was required to complete reclamation of the Bird's Nest site by May 1, 2008. Plaintiff was informed that any reclamation work "not completed within the allotted time frame

4    - OPINION AND ORDER

will be accomplished by the Forest Service utilizing the currently held bond." Schmidt Decl. Ex. 1 at 122.

On December 19, 2007, plaintiff requested a 60-day extension to post bond because of his health and difficulty securing the increased bond amount. Schmidt granted plaintiff an extension until March 11, 2008.

On February 21, 2008, Schmidt told plaintiff that if the bond was not paid by the March 11 deadline, the Forest Service "will assume that you will be moving forward with reclamation of the Birds Nest" site. Schmidt Decl. Ex. 1 at 127.

On February 27, 2008, Schmidt denied plaintiff's second request to extend the bond deadline "due to unusual weather conditions," stating that weather conditions were unrelated to plaintiff's ability to secure the bond amount. Schmidt Decl. Ex. 1 at 128. Schmidt agreed to extend the reclamation date if plaintiff chose to reclaim the site rather than post bond.

On March 6, 2008, Schmidt responded to a facsimile from plaintiff and acknowledged his continued disagreement with the bond amount. Schmidt reminded plaintiff that the bond must be submitted by March 11, 2008, or the Forest Service would "assume that you intend to reclaim the Birds Nest Claim site and we'll move forward to set a schedule with you to remove equipment, structures and reclaim the site." Schmidt Decl. Ex. 1 at 129.

On March 12, 2008, Schmidt informed plaintiff that he had

5    - OPINION AND ORDER

failed to post the bond by the March 11 deadline, and that the Forest Service had "exhausted the process required by law to approve continued operations." Schmidt Decl. Ex. 1 at 130. Schmidt further declared that "it is in the best interest of the government to move forward with the reclamation process as outlined in your expired Plan of Operations." Schmidt Decl. Ex. 1 at 130. Schmidt recognized that the Bird's Nest site was inaccessible due to snow and "harsh" winter conditions, and informed plaintiff that he was allowed until July 31, 2008 to complete reclamation of the site, including the removal of his structures and equipment. Otherwise, the Forest Service would "use the existing bond to finish reclamation of the site." Schmidt Decl. Ex. 1 at 130.

On July 28, 2008, plaintiff received a facsimile from a Forest Service law enforcement employee. The facsimile included the Forest Service impoundment regulation for personal property and notified plaintiff that he would be "receiving a letter from Law Enforcement that will include more details." Schmidt Decl. Ex. 1 at 131-132.

After receipt of the facsimile, plaintiff removed most of his personal property from the Bird's Nest site. Plaintiff subsequently inquired whether the bond could be reduced to reflect the removal of his personal property, and Schmidt told plaintiff that the bond amount would not be reduced.

On August 6, 2008, Andy Brinkley, a patrol captain with the

6 - OPINION AND ORDER

Forest Service, sent a letter to plaintiff stating that the Forest Service was "beginning the impoundment process" to remove "personal property and structures stored" on the Bird's Nest claim. Schmidt Decl. Ex. 1 at 133. Brinkley declared that without an approved plan of operations or permit, plaintiff's "property and structures are in trespass on National Forest System Lands." Schmidt Decl. Ex. 1 at 133. Brinkley's letter purported to give plaintiff "formal notice" that his "personal property and structures" were in "violation of law or regulation," "subject to impoundment," and could be "impounded at any time after August 8, 2008." Schmidt Decl. Ex. 1 at 133. Brinkley advised plaintiff of the following:

> You can regain the personal property within the 90-day period by submitting proof of ownership and paying all expenses incurred by the Forest Service in advertising, gathering, moving, impounding, storing and otherwise caring for the property, and also for the value of the use of the site occupied during the period of trespass. The structures will be disassembled and disposed of onsite. Non burnable items from the structures will be hauled to appropriate disposal sites.

Schmidt Decl. Ex. 1 at 133. Plaintiff was not issued a citation for trespass or informed that he could appeal or otherwise challenge the finding of trespass or the impoundment of his property or structures.

On August 18, 2008, plaintiff responded to Brinkley's letter regarding the removal of his structures. Schmidt Decl. Ex. 1 at 135. No one from the Forest Service contacted plaintiff or responded to his letter. Plaintiff subsequently met with a Forest

7  -  OPINION AND ORDER

Service employee and was told that "nothing" could be done "about the situation regarding [his] structures," because Schmidt "had turned the matter over to the legal department." Schmidt Decl. Ex. 1 at 135.

In November of 2008, the Forest Service "impounded" plaintiff's mining structures and posted notices on the structures declaring them to be government property.

On March 19, 2009, Schmidt wrote plaintiff and informed him that the Forest Service "was moving forward with reclamation due to your refusal to submit an adequate bond" for the proposed plan of operations. Buchal Decl. Ex. 1 at 1.

On April 30, 2009, plaintiff met with Schmidt and "proposed to remove the Bird's Nest structures himself." Buchal Decl. Ex. 1 at 2. In response, Schmidt "explained that the structures were now government property as the result of the impoundment process that occurred in calendar year 2008" but that she would "consider his proposal and get back to him." Buchal Decl. Ex. 1 at 2. The next day, Schmidt called plaintiff and told him "that upon review of the law enforcement impoundment process I have no authority to engage a private citizen at this stage and [that I] had safety concerns." Buchal Decl. Ex. 1 at 2.

On May 28, 2009, plaintiff wrote a letter to the Regional Forester and requested a stay of the "demolition of structures that are on [his] valid mining claims." Schmidt Decl. Ex. 1 at 135.

8   - OPINION AND ORDER

Plaintiff explained that he had not agreed to the higher bond amount but now understood that "in order to continue my mining operations[,] I must sign the Plan of Operation and post the Bond and I am prepared to do that." Schmidt Decl. Ex. 1 at 135. Plaintiff expressed frustration at the lack of information he received about the removal of his property, noting that Schmidt "had turned this over to the legal section of the USFS" without providing "any information as to which agency employee or division is handling this case." Schmidt Decl. Ex. 1 at 135. Plaintiff also contested the Forest Service's authority to impound or dismantle his structures and argued that the impoundment regulation applied only to personal property and not to buildings or structures on "valid mining claims." Schmidt Decl. Ex. 1 at 135-36. Plaintiff cited the following Forest Service policy as support for his argument:

> Law enforcement personnel shall not destroy real property without the advice of the U.S. Department of Agriculture, Office of the General Counsel, or by court order. Make an attempt to get the owner to remove unauthorized property, both real and personal. If an owner refuses to remove the property, advise the United States Magistrate Judge or U.S. [A]ttorney of the request to have the courts instruct the owner to remove the property at the time of criminal action. (FSM 2818.4).

Schmidt Decl. Ex. 1 at 137.

Plaintiff also informed the Regional Forester that even though he offered to pay the higher bond amount, Schmidt had refused his offer on grounds "that the structures that had been built by me and

9   - OPINION AND ORDER

were used for my mining operations, were now the property of the

USFS." Schmidt Decl. Ex. 1 at 137. Plaintiff concluded:

> I therefore believe that the Forest Service personnel
> that are or have been involved in decisions made
> regarding my Plan of Operation and Bond are in non-
> compliance [with Forest Service regulations and internal
> policies] regarding the actions that are to be undertaken
> regarding structures on valid claims. Due to the facts
> stated above, I [do] not believe that the structures are
> property of the USFS, because they are located on a valid
> claim and proper procedure under 36 CFR 228 [and] Forest
> Service Manual 2817 to 2819.3 have not been followed. I
> am therefore requesting a stay on the action to demolish
> the structures, so that I may sign the Plan of Operation
> and cover the Bond, therefore fulfilling the requirements
> of 36 CFR 228.

Schmidt Decl. Ex. 1 at 137-38.

Schmidt received a copy of plaintiff's letter on May 29, 2009,

prior to the beginning of the reclamation process. Buchal Decl.

Ex. 1 at 11-12. The Regional Forester received plaintiff's letter

by June 3, 2009, before plaintiff's structures were disassembled

and destroyed on June 4, 2009. Buchal Decl. Ex. 1 at 9.

On June 9, 2009, the Regional Forester responded to

plaintiff's request for stay of the demolition, asserting

compliance with all Forest Service regulations. The Regional

Forester repeated that without an approved plan of operations,

plaintiff's structures were in "trespass" and subject to

impoundment. The Regional Forester also informed plaintiff that

the reclamation of the Bird's Nest claim began on June 1, 2009, and

that his structures had been dismantled on June 4, 2009. Schmidt

Decl. Ex. 1 at 139-40.

10  - OPINION AND ORDER

Based on the photographs provided by defendants and plaintiff, plaintiff's mining structures were disassembled, with portions of the buildings demolished by a backhoe and then burned. Schmidt Decl. Ex. 1 at 11-30; Buchal Decl. Ex. 6 at 1-5.

On November 25, 2009, plaintiff filed suit. At the time, plaintiff was eighty-one years old.

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The materiality of a fact is determined by the substantive law on the issue. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

11 - OPINION AND ORDER

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

### A. Bivens Claim

Plaintiff asserts a Bivens claim against Schmidt, alleging that she deprived plaintiff of his property without due process of law. Schmidt moves for summary judgment on this claim, arguing that the court should not recognize a Bivens action where plaintiff had an adequate remedy under the Administrative Procedures Act (APA). See 5 U.S.C. § 701, et seq. Plaintiff likewise moves for summary judgment, arguing that the APA does not provide an adequate or effective remedy, and that Schmidt should be held liable for violating plaintiff's due process rights.

Under Bivens, courts may award damages against federal officials to compensate plaintiffs for violations of their federal constitutional rights. Bivens, 403 U.S. at 396-97; see also Wilkie v. Robbins, 551 U.S. 537, 549-50 (2007). "However, Bivens remedies are not available to compensate plaintiffs for all constitutional torts committed by federal officials." Western Ctr. for Journalism v. Cederquist, 235 F.3d 1153, 1156 (9th Cir. 2000). The Supreme

12   - OPINION AND ORDER

Court "has focused increased scrutiny on whether Congress intended the courts to devise a new *Bivens* remedy," Western Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1119 (9th Cir. 2009), and "in most instances [the Court has] found a *Bivens* remedy unjustified." Wilkie, 551 U.S. at 550 (citing cases).

In *Wilkie v. Robbins*, the Supreme Court "distilled its 35-year history of *Bivens* jurisprudence into a two-step analysis for determining congressional intent as to the appropriateness of a *Bivens* remedy." Western Radio, 578 F.3d at 1120 (citing Wilkie, 551 U.S. at 550). First, a court must determine "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Wilkie, 551 U.S. at 550 (citing Bush v. Lucas, 462 U.S. 367, 378 (1983)). A *Bivens* remedy generally is unavailable when "'Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur' in the course of administering a federal program." Cederquist, 235 F.3d at 1156 (quoting Schweiker v. Chilicky, 487 U.S. 412, 423 1988)).

Second, a court must "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." Wilkie, 551 U.S. at 554. In doing so, "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed,

13 - OPINION AND ORDER

however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." Bush, 462 U.S. at 378. "Even where Congress has given plaintiffs no damages remedy for a constitutional violation, the Court has declined to create a right of action under *Bivens* when doing so 'would be plainly inconsistent with Congress' authority in this field.'" Western Radio, 578 F.3d at 1120 (quoting Chappell v. Wallace, 462 U.S. 296, 304 (1983)).

## 1. Adequate and Effective Remedy

Schmidt argues that because plaintiff had the opportunity to appeal the bond amount for his plan of operations, the APA provided an existing and alternative process to protect his property interests and due process rights.   Schmidt emphasizes that plaintiff understood the bond was a requirement for the plan of operations, and that if he did not post the bond the Forest Service would begin procedures to reclaim the land.   Thus, Schmidt maintains that the availability of APA procedures for the bond determination precludes *Bivens* liability for the impoundment and demolition of his structures.   Plaintiff responds, and I agree, that in these circumstances the APA does not provide an adequate or effective remedy for the alleged unconstitutional destruction of plaintiff's property.

The APA permits challenges to set aside final agency decisions if arbitrary, capricious, or unauthorized by law, and it also

14   - OPINION AND ORDER

authorizes suit to compel agency action unlawfully withheld. See 5 U.S.C. § 706. Here, Schmidt issued a final decision regarding the bond amount, and plaintiff had the opportunity to appeal and seek judicial review of that decision. The crux of plaintiff's claim, however, is not the increase of his bond but the destruction and removal of his mining structures. Thus, if Schmidt had issued a final, reviewable decision regarding the impoundment and demolition of plaintiff's structures, the APA likely would provide plaintiff with an adequate and effective remedy. See Western Radio, 578 F.3d at 1122 (under Wilkie, the APA generally "constitutes an 'alternative, existing process'" for "clams based on agency action and inaction").

However, Schmidt issued no final agency decision declaring plaintiff's structures in trespass and subject to impoundment and removal by the Forest Service. Instead, a Forest Service patrol captain merely notified plaintiff that his structures were in "trespass" without an approved plan of operations, and that his personal property and structures were subject to "impoundment." Schmidt subsequently informed plaintiff that his structures had become "government property" and that she would not "interfere" with the impoundment and reclamation process. Thus, unlike Wilkie or Western Radio, plaintiff was left with no final agency decision that he could appeal or otherwise challenge under the APA. Wilkie, 551 U.S. at 552; Western Radio, 578 F.3d at 1122; see also Webster

15  - OPINION AND ORDER

v. Doe, 486 U.S. 592, 599 (1988) ("The APA's comprehensive provisions . . . allow any person adversely affected or aggrieved by agency action to obtain judicial review thereof, *so long as the decision challenged represents a final agency action for which there is no other adequate remedy in a court.*") (citation omitted; emphasis added). The APA cannot supply an adequate remedy when no final decision authorizes the challenged agency action.

In fact, Schmidt specifies no remedial mechanism through which plaintiff could have disputed the finding of trespass and the impoundment and ultimate destruction of his property. Instead, Schmidt simply repeats the mantra that plaintiff had the opportunity to appeal the increased bond amount under the APA, thereby protecting his property interests in the structures. At oral argument, however, Schmidt conceded that plaintiff could not have raised the issues of trespass, impoundment, or removal of his structures during the appeal of his bond amount. Moreover, even if plaintiff had successfully appealed the bond decision and obtained a lower bond amount, the Forest Service would have considered plaintiff's property subject to impoundment and destruction if he remained unable to post the bond.

Thus, while the APA afforded plaintiff an adequate remedy to appeal his bond amount, it did not and does not provide plaintiff with an adequate or effective remedial mechanism for the alleged unconstitutional destruction of his property.

16  - OPINION AND ORDER

## 2. Reasons For and Against *Bivens* Remedy

Schmidt next argues that the court should acknowledge "special factors counseling hesitation," because recognition of a *Bivens* claim in these circumstances "would expose every district ranger who increased the reclamation bond on a mining claim to individual liability in federal courts." Def. Schmidt's Mem. in Supp. at 12. Again, this argument misstates the issue and misses the point. While plaintiff does not agree with Schmidt's bond decision or her insistence on the removal of his structures, his *Bivens* claim does not arise from those decisions. Rather plaintiff's claim arises from Schmidt's failure to afford due process protections before his structures were destroyed.

Further, I recognize that imposing liability for a bond decision would run afoul of the Supreme Court's ruling in *Wilkie*. There, a rancher plaintiff brought a First Amendment retaliation claim against Bureau of Land Management employees, alleging that numerous regulatory, administrative, and enforcement actions were taken against him in retaliation for his refusal to grant an easement to the government. Wilkie, 551 U.S. at 542-45, 551-53, 556. The Court declined to recognize a *Bivens* retaliation action in those circumstances, reasoning that such recognition would interfere with an agency's ability to engage in "hard bargaining" to further a legitimate government purpose. Id. at 556-58, 561-62. The Court concluded: "A judicial standard to identify illegitimate

17   - OPINION AND ORDER

[government] pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tortlike liability when Government employees are unduly zealous in pressing a governmental interest affecting property would invite an onslaught of *Bivens* actions." Id. at 562.

Unlike the facts in *Wilkie*, plaintiff's due process claim does not place at issue Schmidt's authority to impose a higher bond amount or her motivation for doing so, and it does not create an unworkable analytical framework.    Instead, plaintiff's claim challenges the lack of opportunity to be heard regarding the impoundment and demolition of his structures, as well as the lack of authority or necessity for their destruction.  Plaintiff thus asserts straightforward due process claims based on the alleged unconstitutional and arbitrary deprivation of his property, a deprivation for which no other remedy is available.    Therefore, resolution of plaintiff's due process claims do not "raise[] a serious difficulty of devising a workable cause of action" and do not implicate the concerns raised by the Supreme Court in *Wilkie*. Id. at 562.

Granted, recognition of plaintiff's *Bivens* claim could affect Forest Service procedures when seeking the removal of unauthorized mining structures.  However, I do not find that such potential "counsels hesitation" or outweighs the reasons to allow plaintiff's claim.    Instead, I find that defendants' lack of authority to

18  - OPINION AND ORDER

impound and destroy plaintiff's structures, the opaque and bureaucratic maze of decision-making by defendants, and the apparent disregard for plaintiff's due process and property rights warrant the recognition of a *Bivens* claim in this case.

Significantly, at the time plaintiff built the structures, he was not a trespasser or a "squatter" on public lands. Rather, plaintiff owns a mining claim and built the structures pursuant to his claim and the plan of operations that he had held for at least twenty years. "The owner of a mining claim owns property, and is not a mere social guest of the [government] to be shooed out the door when the [government] chooses." United States v. Shumway, 199 F.3d 1093, 1103 (9th Cir. 1999). Further, plaintiff's structures were not akin to old, rusty vehicles or other scattered debris creating a nuisance or hazard; they were seemingly well-made, well-maintained buildings constructed for the purpose of carrying out an approved plan of mining operations. See Schmidt Decl. Ex. 1 at 11-13, 25-26; Buchal Decl. Ex. 1 at 17-18, Ex. 6 at 1-2. Had Schmidt received plaintiff's bond payment, his structures would have remained standing with Schmidt's and the Forest Service's blessings.

Despite plaintiff's valid mining claim and attendant property rights, Schmidt and the Forest Service took the rather extraordinary action of destroying several mining structures - generally considered real property - without clear authorization to

19 - OPINION AND ORDER

do so.   Schmidt cites no statutory or regulatory provision that authorizes the Forest Service to assert government ownership over mining structures and demolish them pursuant to its "impoundment" process, particularly when the structures in question were built pursuant to a valid mining claim and plan of operations.   Instead, the impoundment process allows the Forest Service to impound and ultimately dispose of "inanimate personal property" on Forest Service land "without authorization."   The pertinent regulation is entitled "Impounding of personal property" and provides:

> (a) Automobiles or other vehicles, trailers, boats, and camping equipment and other inanimate personal property on National Forest System lands without the authorization of a Forest officer which are not removed therefrom within the prescribed period after a warning notice as provided in this regulation may be impounded by a Forest officer. . . .

***

> (c) Personal property impounded under this regulation may be disposed of at the expiration of 90-days after the date of impoundment. The owner may redeem the personal property within the 90-day period by submitting proof of ownership and paying all expenses incurred by the United States in advertising, gathering, moving, impounding, storing, and otherwise caring for the property, and also for the value of the use of the site occupied during the period of the trespass.

> (d) If the personal property is not redeemed on or before the date fixed for its disposition, it shall be sold by the Forest Service at public sale to the highest bidder. If no bid is received, the property, or portions thereof, may, in the discretion of the responsible Forest officer, be sold at private sale or be condemned and destroyed or otherwise disposed of. . . .

36 C.F.R. § 262.12.

Notably, § 262.12 does not apply to buildings or improvements to real property such as mining structures; the regulation applies to "inanimate personal property." Schmidt identifies no statutory or regulatory definition that categorizes mining structures or other improvements to real property as "inanimate personal property."[1] Thus, § 262.12 does not grant the Forest Service authority to "impound" mining structures or assert government ownership over them.

Schmidt also references 36 C.F.R. § 228.10 as authority for the removal of plaintiff's structures. However, that regulatory provision simply provides that mining operators shall remove structures and equipment within a "reasonable time" after mining operations cease; it does not authorize impoundment, government ownership, or demolition of mining structures, particularly without opportunity for hearing.[2] Likewise, plaintiff's plan of operations requires him to remove his structures "upon the termination of operations, sale, or abandonment of claim"; it does not state that mining structures revert to the government upon expiration of the

---

[1]In fact, the Forest Service did not view plaintiff's mill as a temporary structure. Buchal Decl. Ex. 1 at 17.

[2]Plaintiff maintains that his mining operations had not ceased or been abandoned, and that he continued to pursue limited mining on the claim. See 36 U.S.C. § 228.4. Thus, according to plaintiff, mining operations had not "ceased" and removal of the structures was not required under the regulation or his plan of operations. Regardless of whether plaintiff's interpretation is correct, he had no meaningful opportunity to present this argument before his structures were destroyed.

21   - OPINION AND ORDER

plan or otherwise authorize the Forest Service to impound or destroy the structures. Schmidt Decl. Ex. 1 at 8; compare Paulina Lake Historic Cabin Owners Ass'n v. U.S.D.A. Forest Serv., 577 F. Supp. 1188, 1195 (D. Or. 1983) (special use permit allowing recreational structures on Forest Service lands expressly provided that the structures would become "property of the United States" if not removed within a "reasonable period" after expiration of the permit).

Nevertheless, sometime between March 12, 2008 and July 28, 2008, Schmidt apparently determined that plaintiff's structures were in trespass or otherwise subject to removal by the Forest Service. However, no record of this decision was provided to plaintiff or submitted to the court. As Schmidt rendered no reviewable final decision regarding the removal of plaintiff's structures, it remains unclear by what authority and under what administrative process plaintiff's structures were found to be in trespass and subject to impoundment and demolition.

Adding to the confusion over when, why, and how the trespass and impoundment decisions were made, Schmidt told plaintiff that she would not interfere with the impoundment and removal of his structures because reclamation of the Bird's Nest site had become a law enforcement issue. However, those within law enforcement apparently disagreed with Schmidt's characterization and viewed the removal of plaintiff's structures as an "administrative outcome of

22  - OPINION AND ORDER

a minerals review process, with law enforcement providing some support." Buchal Decl. Ex. 1 at 10.[3] Even more unsettling is the fact that plaintiff tried to prevent the demolition of his structures, only to have Schmidt dismiss his overtures on grounds that his mining structures had become "government property" through the "impoundment process." Buchal Decl. Ex. 1 at 2. It therefore appears that Schmidt rendered and enforced legal decisions regarding the disposition of plaintiff's property, decisions that were essentially unexplained and unreviewable.

I find that the lack of transparency and accountability in this decision-making process weighs heavily in favor of allowing plaintiff's *Bivens* claim, consistent with congressional intent regarding agency actions. Though unavailable to plaintiff, an underlying purpose of the APA is to provide a framework for judicial review of agency decisions to ensure "a rational connection between the facts found and the decision made." Native Ecosystems Council v. Tidwell, 599 F.3d 926, 932 (9th Cir. 2010)

_____

[3]In fact, Forest Service law enforcement personnel had serious concerns about the legality of destroying plaintiff's structures without a formal administrative or judicial decision. See Buchal Decl. Ex. 1 at 13 ("Sounds like removal of real property to me. If there's been an administrative or civil decision that we're carrying out, that would be useful to know. . . *Can you advise me if there's some existing determination that has cleared the way to remove the structures?"*) (emphasis added); see also Buchal Decl. Ex. 1 at 10 ("I had discussed the background concerns I had with removal of 'real property' with [two Forest Service employees].")*;* Buchal Decl. Ex. 1 at 11 ("Any advice and are we treading new ground here? . . . [I]t still makes me nervous!").

23  — OPINION AND ORDER

(citation omitted); see also Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) ("providing broad spectrum of judicial review" is "central purpose" of APA); Cohen v. United States, 650 F.3d 717, 734 (D.C. Cir. 2011) (APA's underlying purpose is to remove "obstacles to judicial review of agency action") (citation omitted). Here, however, defendants' decision-making effectively foreclosed judicial review of the impoundment and intended demolition of plaintiff's structures.

Plaintiff insists that the Forest Service's actions were essentially an end-run around a proper procedure and forum that would have allowed plaintiff to contest the determination of trespass and the impoundment and destruction of his mining structures. Based on these facts, I find it difficult to disagree. If an agency official chooses a decision-making strategy that prevents judicial review of an agency action, the official should not be permitted to employ Bivens as a shield to avoid judicial scrutiny of due process violations that allegedly result. Thus, recognition of plaintiff's claim furthers rather than impedes congressional intent. Western Radio, 578 F.3d at 1120-21.

Finally, recognition of plaintiff's Bivens claim will not unduly hinder the Forest Service's authority to remove unauthorized structures or impose burdensome hearing requirements, because well-established procedures exist to achieve regulatory compliance. For example, rather than pursue a murky and legally questionable

24  - OPINION AND ORDER

trespass, impoundment, and removal process, Schmidt could have issued a final decision or stayed the demolition of plaintiff's structures until his protests and arguments were heard through further administrative or judicial procedures. Additionally, as contemplated by its own policy, the Forest Service could have filed a civil action for trespass and ejectment or sought a court order to show cause why plaintiff's structures should not be held in trespass and removed by a date certain. See United States v. Brunskill, 792 F.2d 938 (9th Cir. 1986) (government filed suit seeking injunctive relief to vacate mining site); United States v. Moore, 2010 WL 373863 (D. Or. Jan. 28, 2010) (government filed suit for trespass and sought ejectment of property from mining site); United States v. Tracy, 2009 WL 3780936 (D. Or. Nov. 10, 2009) (government filed claims for trespass and ejectment from mining site). Plaintiff did not so much as receive a trespass citation that he could have challenged in a violations hearing. It goes without saying that had the Forest Service pursued administrative or judicial proceedings before destroying plaintiff's structures, he would have been afforded the opportunity to be heard and received the process he was due.[4]

---

[4]Schmidt also could have accepted plaintiff's offer to post the bond, untimely as it might have been, or his offer to remove the structures himself, as contemplated under his plan of operations. It remains perplexing why Schmidt and the Forest Service chose the one course of action that implicated plaintiff's due process rights when so many options were available.

25   - OPINION AND ORDER

Thus, recognition of plaintiff's *Bivens* due process claims will not burden or interfere with the Forest Service's ability to enforce mining regulations or remove unauthorized structures. Rather, such recognition merely will require the Forest Service to provide a measure of due process before destroying improvements to real property built pursuant to a valid mining claim. The failure to grant a *Bivens* remedy in these circumstances would give the Forest Service free rein to impound and destroy improvements to real property without discernable agency authority, the opportunity for judicial review, or any remedy for the erroneous deprivation of such property.

To reiterate, I do not allow plaintiff's *Bivens* claim to proceed because Schmidt increased plaintiff's bond, and liability will not arise because of an allegedly erroneous bond calculation. Further, I make no findings and pass no judgment on Schmidt's decisions to increase plaintiff's bond or to request removal of the structures after plaintiff failed to pay the bond. Rather, I allow plaintiff's *Bivens* claim based on the alleged unlawful and arbitrary impoundment and destruction of plaintiff's mining structures, without affording him due process of law.

## B. Qualified Immunity

Schmidt next moves for summary judgment on grounds of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as

26 - OPINION AND ORDER

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To ascertain whether qualified immunity applies, the court determines whether a deprivation of constitutional rights occurred, and whether the constitutional right was clearly established at the time of the deprivation, though not necessarily in that order. Id. at 232-36.

Schmidt first argues that she is entitled to qualified immunity because she was authorized to increase the bond amount and provided plaintiff with notice of her calculations and his rights to appeal. However, as discussed above, the bond amount is not the subject of plaintiff's due process claims. To repeat, plaintiff alleges that Schmidt deprived him of property without due process of law when his structures were deemed in trespass, impounded, and ultimately destroyed.

Next, Schmidt contends that qualified immunity should apply because she had no involvement in the demolition of plaintiff's structures, and she took no action after plaintiff removed personal property from the Bird's Nest site. However, Schmidt is the District Ranger and, based on the current record before the court, referred the removal of plaintiff's structures to law enforcement. At minimum, Schmidt's decisions triggered the impoundment and demolition of plaintiff's structures. Further, in March 2009,

Schmidt informed plaintiff that the Forest Service was "moving forward with reclamation," and in April 2009, Schmidt again informed plaintiff that the impoundment and reclamation process would go forward and that she would not interfere with that process. Buchal Decl. Ex. 1 at 1, 2. Schmidt is also listed as the "Accountable Property Manager" on the report describing the plan to dismantle and dispose of plaintiff's property. Buchal Decl. Ex. 1 at 6. Therefore, I reject Schmidt's contention that she had no involvement in the destruction of plaintiff's mining structures.

Finally, Schmidt argues that plaintiff cannot sustain a due process claim because he had no protectable property interest in his structures after he failed to post bond, or, at minimum, such property interest was not clearly established. According to Schmidt, once plaintiff no longer had an approved plan of operations that authorized the maintenance of his structures, the Forest Service had the right to impound and remove the structures and reclaim the land. Thus, Schmidt maintains that plaintiff essentially "abandoned" his structures and any interest he had in them by failing to pay the bond. I disagree.

Schmidt cites no authority to support the notion that the expiration of an approved plan of operations extinguishes any and all property rights in mining structures built pursuant to the plan. See Shumway, 199 F.3d at 1103 (owners of mining claims have

28 - OPINION AND ORDER

property and possessory rights). Likewise, Schmidt identifies no statute or regulation that deems unauthorized mining structures "abandoned" or under government ownership if not removed by a specified deadline. Schmidt instead relies on several court decisions that found mining structures in trespass without an authorizing plan of operations. See Brunskill, 792 F.2d at 941; Moore, 2010 WL 373863, at *5-6; Tracy, 2009 WL 3780936, at *2-3.

Importantly, in none of these cases did the courts find that the lack of an approved plan of operations resulted in the forfeiture or abandonment of property rights in mining structures, and no decision held that the Forest Service could destroy or remove mining structures without affording notice and hearing. For example, in Brunskill, the defendants' mining claim had been declared invalid and the defendants had "never secured approval of an operating plan for placing or maintaining the structures on the land." Brunskill, 792 F.2d at 941. The Ninth Circuit thus affirmed the district court's order directing the defendants to remove their mining structures. Id.

Likewise, in Moore the government brought a claim of trespass and sought ejectment, injunctive relief, and damages after the defendants "moved sundry household effects, travel trailer(s) and vehicles onto the site,[] built structures and . . . significantly altered the National Forest site they occupy" over several years without an approved plan of operations. Moore, 2010 WL 373863, at

29   - OPINION AND ORDER

*6. The district court found that the defendants used the mining site "primarily for residential purposes with occasional mining incident to that purpose," and that such activities not only required a plan of operations but also constituted use of the site that was not "reasonably incident to mining." Id. at *5. Therefore, the court ordered the removal of their personal property and structures.

Finally, in Tracy the government brought claims for trespass and ejectment. The district court found the defendant in trespass based on the following facts:

Tracy moved excavating machinery and mining equipment onto his claim without Forest Service knowledge or permission. By September 2009, Tracy had felled about twenty mature trees, built a road, diverted a creek, and created two ponds. His operations discharged dirt and gravel into Sucker Creek, which is habitat for coho salmon, a threatened species.

Tracy, 2009 WL 3780936, at *1. The court found that "[b]y choosing to mine without an approved plan of operations, Tracy became a trespasser on the national forest." Id. at *3. The court thus held that the government was entitled to summary judgment on its claim of trespass. Id.

The decisions in Brunskill, Moore and Tracy do not hold or even suggest that the defendants forfeited or abandoned their property interests in their mining structures, nor did the courts imply that the Forest Service could remove the structures without affording procedural protections. These decisions merely support

30 - OPINION AND ORDER

the Forest Service's right to pursue injunctive relief and removal
of the structures in such circumstances.  In fact, by filing suit
against the defendants in each case, the Forest Service recognized
the property interests at stake and provided the defendants with
due process before seeking to remove allegedly unauthorized mining
structures.     Thus,  even  if  plaintiff's  structures  became
"unauthorized" once his plan of operations expired, no case cited
by Schmidt supports her argument that an expired plan of operations
extinguished plaintiff's property rights and entitlement to due
process.[5]

Accordingly, these cases do not place in question plaintiff's
clearly established right to due process of law before the
deprivation of his mining structures, and Schmidt's motion for
summary judgment on grounds of qualified immunity is denied.

## C.  Procedural and Substantive Due Process Claims

I next consider plaintiff's motion for summary judgment and
whether he has established a violation of his procedural or
substantive due process rights.

"The Due Process Clause of the Fifth Amendment forbids the
federal government from depriving persons of life, liberty, or

_____

[5]I find it interesting that the defendants in Brunskill,
Moore and Tracy, who disregarded and even flouted Forest Service
regulations for years, were afforded more procedural protections
than plaintiff, who apparently complied with the terms of his
plan of operations, and, until the bond dispute, was cooperative
with Forest Service officials.

31   - OPINION AND ORDER

property, without due process of law." Buckingham v. Sec'y of U.S. Dep't of Agric., 603 F.3d 1073, 1081 (9th Cir. 2010) (citation omitted). At its essence, procedural due process requires "that a person deprived of property be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 984 (9th Cir. 1998) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). Procedural due process rules "minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which [the government] proposes to deprive them of protected interests." Carey v. Piphus, 435 U.S. 247, 259-60 (1978). Thus, whether the deprivation was justified is not an element of the procedural due process inquiry; at issue is the adequacy of the procedural protections. Id. at 266.

Here, despite his property interests in his mining claim and structures, plaintiff merely was given notice that his structures were in trespass and would be impounded and eventually "disassembled and disposed of on-site." Schmidt Decl. Ex. 1 at 133. As Schmidt conceded at oral argument, plaintiff was given no meaningful opportunity to challenge the finding of trespass, the applicability of impoundment procedures, or the demolition of his structures. When plaintiff tried to contest these actions, he was told that his mining structures were now "government property," there was "nothing to be done," and that the matter had been turned

over to the "legal department" or "law enforcement." Plaintiff even attempted to obtain some type of informal review from the Regional Forester, who did not respond until after plaintiff's structures were destroyed and did not address the substance of plaintiff's arguments in any event. Given the length of time between the "impoundment" of plaintiff's structures and their ultimate destruction, Schmidt had ample opportunity to provide some type of administrative hearing or seek injunctive relief. Schmidt asserts no compelling urgency associated with reclamation of the Bird's Nest site that justifies the failure to provide a measure of due process.

Balancing the property interest at stake, the risk of erroneous deprivation in the absence of further administrative or judicial process, and the slight burden on the government in providing procedural protections, I find that plaintiff was not afforded adequate procedures to protect his interests. Buckingham, 603 F.3d 1073, 1081-82 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Even when construed in Schmidt's favor, no genuine issue of material fact precludes the finding that plaintiff was not afforded the opportunity to be heard at a meaningful time or in a meaningful manner.

Plaintiff also alleges a substantive due process claim. Substantive due process protects an individual "against arbitrary and capricious government action, even when the decision to take

33   - OPINION AND ORDER

that action is made through procedures that are in themselves constitutionally adequate." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1407 (9th Cir. 1989). Government conduct that is an "abuse of power lacking any reasonable justification in the service of a legitimate governmental objective" gives rise to a violation of substantive due process. Shanks v. Dressel, 540 F.3d 1082, 1088 (9th Cir. 2008) (internal quotation marks and citations omitted). "To establish a violation of substantive due process, the plaintiffs must prove that the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" Sinaloa Lake, 882 F.2d at 1407 (quoting Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395 (1926)).

As explained above, plaintiff possessed a clearly established, protectable property interest in his mining structures. Further, Schmidt and the Forest Service had no authority to impound and assert government ownership over plaintiff's mining structures for the purpose of destroying them. Schmidt and the Forest Service offer no explanation why plaintiff was not given an opportunity to administratively or judicially contest the impoundment or destruction of his property, or why his offers to pay the bond and/or remove the structures himself were not accepted. Finally, Schmidt offers no reason, such as an environmental hazard or other urgency, that compelled the demolition of plaintiff's structures,

particularly when the structures stood on the Bird's Nest site for almost twenty years.

However, I cannot find as a matter of law that Schmidt was "bent on destroying [plaintiff's structures] for no legitimate reason." Sinaloa Lake, 882 F.2d at 1410. Rather, I find that plaintiff has raised genuine issues of fact as to whether the impoundment and removal of his structures was an "abuse of power lacking any reasonable justification in the service of a legitimate governmental objective." Shanks, 540 F.3d at 1088.

Accordingly, plaintiff's motion for summary judgment is granted with respect to his procedural due process claim and denied with respect to his substantive due process claim.

## D.  Conversion Claim

The United States moves for summary judgment on plaintiff's conversion claim, arguing that he cannot establish the necessary elements of conversion.[6]  Plaintiff likewise moves for summary judgment.

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay

---

[6]Schmidt did not move for summary judgment on grounds that a claim for conversion under the Federal Tort Claims Act provides an adequate remedy to protect plaintiff's due process rights, and the Supreme Court has held that the FTCA and *Bivens* are "parallel, complementary causes of action." Western Radio, 578 F.3d at 1124 (quoting Carlson v. Green, 446 U.S. 14, 19-20 (1980)).

35  - OPINION AND ORDER

the other the full value of the chattel." Becker v. Pac. Forest
Indus., Inc., 229 Or. App. 112, 116, 211 P.3d 284 (2009) (internal
quotation marks and citation omitted). The following factors are
relevant to establish conversion:

    (a) the extent and duration of the actor's exercise of
    dominion or control;
    (b) the actor's intent to assert a right in fact
    inconsistent with the other's right of control;
    (c) the actor's good faith;
    (d) the extent and duration of the resulting interference
    with the other's right of control;
    (e) the harm done to the chattel;
    (f) the inconvenience and expense caused to the other.

Id. "The above list of factors to be considered in determining
whether a conversion occurs is nonexclusive, and no one factor is
considered dispositive." Id. (citations omitted).

    The United States maintains that plaintiff had no legitimate
property interest in his structures after they became property of
the government through the impoundment process, and therefore the
destruction of the structures did not interfere with plaintiff's
right to control them. For the reasons explained above, plaintiff
retained a property interest in his structures that was not
extinguished, forfeited, or abandoned when he failed to pay the
bond for his plan of operations. The government's motion is
therefore denied.

    At the same time, I find that questions of fact exist
regarding the Forest Service's intent to assert a right
inconsistent with plaintiff's right to control his mining

36  - OPINION AND ORDER

structures and its good faith in impounding and removing plaintiff's structures. Accordingly, plaintiff's motion for summary judgment must be denied on this claim.

## CONCLUSION

For the reasons explained above, Schmidt's and the United State's motions for summary judgment (docs. 23, 27) are DENIED. Plaintiff's Cross-Motion for Summary Judgment (doc. 31) is GRANTED with respect to his procedural due process claim and DENIED with respect to his substantive due process and conversion claims.

IT IS SO ORDERED.

Dated this _____ day of November, 2011.

Ann Aiken
United States District Judge

37    - OPINION AND ORDER