1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3

4         THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6

7   JAMES W. EDGAR,                    )
                                       )
8                     Plaintiff,       )
                                       )
9              v.                      ) No. 09-6376-AA
                                       )
10  DEBORAH SCHMIDT and UNITED STATES  )
    OF AMERICA,                        )
11                                     )
                      Defendants.      )
12  _____)

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  EUGENE, OREGON

17

18             WEDNESDAY, JUNE 22, 2011

19                  PAGES 1 - 38

20

21

22                      Kristi L. Anderson
                        Official Federal Reporter
23                      United States Courthouse
                        405 East Eighth Avenue
24                      Eugene, Oregon 97401
                        (541) 431-4112
25                      Kristi_Anderson@ord.uscourts.gov

```
1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4    James L. Buchal
     Murphy & Buchal, LLP
5    2000 SW First Avenue
     Suite 320
6    Portland, Oregon 97201
     (503) 227-1011, Ext. 2
7    Fax: (503) 227-1034
     Email: jbuchal@mbllp.com
8

9    FOR THE DEFENDANTS:

10   Kevin C. Danielson
     US Attorney's Office
11   1000 S.W. Third Avenue
     Suite 600
12   Portland, Oregon 97204
     (503) 727-1000
13   Fax: (503) 727-1117
     Email: kevin.c.danielson@usdoj.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        PROCEEDINGS

2                  WEDNESDAY, JUNE 22, 2011

3              THE CLERK:  This is the time set for oral argument

4    in Case No. 09-06376, Edgar versus Schmidt.

5              THE COURT:  Counsel, I have read everything, so I

6    just want you to understand that, and I will probably have

7    some questions.

8              But on behalf of the government, go ahead.

9              MR. DANIELSON:  Kevin Danielson for the United

10   States and for Deborah Schmidt.

11             THE COURT:  Go ahead.  I will hear anything you

12   wish to add.

13             MR. DANIELSON:  I would like to -- I mean, I think

14   we have fully briefed all of the issues that are before the

15   court.  I would like to deal with the Bivens action first,

16   Your Honor.

17             There are three reasons the Bivens action should

18   be dismissed.  The first is in Ashcroft v. Iqbol the court

19   said in order to maintain a Bivens action, you have to show

20   and plead that the federal employee did something wrong.

21   That they violated the Constitution.

22             In this case, the only thing that Ms. Schmidt did

23   was she increased the bond amount on the plaintiff's plan of

24   operation.  That is the only action she took.  She did not

25   participate in the removal of the structures from the mining
```

1    claim.  So in a very simple way, they have not pleaded a

2    *Bivens* action against her.

3            The second argument has to do with whether this

4    case even arises to a *Bivens* action, and as the court knows,

5    in *Wilkie v. Robbins*, there's a two-part test.  One, you

6    have to show that there -- there will not be a *Bivens* action

7    if there is an existing alternative remedy.  Here there

8    was -- the alternative remedy was under the Administrative

9    Procedure Act, which the plaintiff pursued for a while but

10   did not take to district court.

11           The second factor under *Wilkie v. Robbins* is

12   before a court creates a *Bivens* action, and as the court

13   knows, it has been not since 19 -- or it has been since

14   1980, that's the last time the Supreme Court created a

15   *Bivens* action, so almost 40 years since a new *Bivens* action

16   has been created.

17           So to -- in this case, the court would have to say

18   that a -- that a district ranger, by increasing the bond

19   amount on a plan of operation for the reclamation bond, that

20   action alone amounted to a violation of the Constitution.

21           The third point is that in order to get qualified

22   immunity, the plaintiff must show that it was a violation of

23   the Constitution, which was clearly established at this

24   time.  And the courts, through -- I think the cases are *U.S.*

25   *v. Tracy*, *U.S. v. Moore*, *Goldfield*, and *Brunskill* all show

1    that if a miner has a mining claim and is trying to operate

2    it without a plan -- without an approved plan of operation,

3    he is a trespass.

4            So I will move on to the position --

5            THE COURT:  No, no, no.  Tell me what opportunity

6    the plaintiff was given to contest the impoundment of his

7    structures and/or the finding that he wasn't trespassed?

8    What opportunity was he given?

9            MR. DANIELSON:  He was given numerous notices and

10   letters saying that if you don't post bond we are going to

11   take down your structures.

12           THE COURT:  Right.  That's if he didn't post bond,

13   but you would have to walk down each line of those

14   procedures.  The impoundment procedure; trespass procedure.

15   He was appealing, clearly, each one of those steps, right?

16   And so can you explain to me, how could plaintiff have

17   raised the issues of impoundment or trespass when the appeal

18   of his bond was still pending, so --

19           MR. DANIELSON:  Well, the appeal of his bond was

20   not pending at that point.

21           THE COURT:  Down the road, but then what chance

22   did he have after that to contest either the decision of

23   trespass or the accusation of trespass or the impoundment?

24           MR. DANIELSON:  I believe the final administrative

25   decision was made on October 18th of '07.  After that he was

1    given until --

2             THE COURT:  October 18th he was given appeal on

3    the -- advised that the regional forester had denied his

4    appeal.

5             MR. DANIELSON:  Correct.

6             THE COURT:  Right.

7             MR. DANIELSON:  And I believe that was, again, the

8    administrative --

9             THE COURT:  He was then notified that he needed to

10   submit -- on November 23rd, 2007, he needed to submit the

11   increased reclamation bond by January 11th, 2008.

12            MR. DANIELSON:  That's correct.

13            THE COURT:  Plaintiff was instructed if he did not

14   submit the bond by January 11th required to complete the

15   reclamation by May 1st, 2008, then, quote, If not completed

16   in that time, the forest service will -- will finish the

17   removal and utilize what bond had been held at that point.

18            But after that -- then December 19th, 2007,

19   plaintiff's letter to Schmidt acknowledging the

20   November 21st letter and asking for a 60-day extension;

21   granted to March 11, 2008.

22            February 21st, Schmidt reminder letter to

23   plaintiff, If bond not paid, then starting reclamation.

24            But again, what procedure -- that's that process,

25   but he still had a mining claim.

1           MR. DANIELSON:  Well, he still has the mining

2    claim today.

3           THE COURT:  Right.

4           MR. DANIELSON:  But when you don't have a plan of

5    operation that's been approved by the forest service, the

6    structures are no longer allowed to be maintained on the

7    mining claim.

8           THE COURT:  Where -- where -- if I look at the

9    statute, where does it allow you to take structures down?

10   Structures, they are not personal property.

11          MR. DANIELSON:  Well, the impoundment statute

12   definitely refers to personal property.

13          THE COURT:  Right.

14          MR. DANIELSON:  The structures in this case,

15   probably different than any other real estate transaction,

16   our understanding, are not -- is not real property.  These

17   structures are personal property in this case.  And the

18   reason they are is because they don't go with the land

19   necessarily.  The land belongs to the forest service.

20          THE COURT:  I totally understand the forest

21   service leasing of property.

22          MR. DANIELSON:  Okay.

23          THE COURT:  But there's a difference between

24   structures and per se personal property, and where does it

25   say in that -- in the code where does it debate that

1    distinction?  Because it's substantially more than a piece

2    of personal property?

3            MR. DANIELSON:  I don't believe it says that in

4    the regulations.  But I think as a matter of law when the

5    structures don't go -- are not part of the real estate, that

6    they are by definition in this case personal property.  In

7    fact, the plaintiff has admitted that it's personal

8    property, and the way that -- in the sense that they have

9    sued the United States for conversion.  Conversion is the

10   inappropriate and illegal --

11           THE COURT:  They served the United States with a

12   number of theories.  That's one of their theories.

13           MR. DANIELSON:  Well, their only theory against

14   the United States is conversion.

15           THE COURT:  Right, but on this action before this

16   court.

17           MR. DANIELSON:  There is a *Bivens* action --

18           THE COURT:  Right.

19           MR. DANIELSON:  -- and a conversion action.

20           THE COURT:  Right.

21           MR. DANIELSON:  That's all before the court.  It

22   seems to me that when he says we converted his property, and

23   conversion only applies to personal property, he has totally

24   agreed that the structures were personal property.

25           THE COURT:  Is that accurate, Mr. Buchal?  Is that

1    what you --

2             MR. BUCHAL:  Paragraph 9 of the complaint says

3    that "Defendant committed conversion by destroying

4    plaintiff's property or otherwise infringed upon plaintiff's

5    rights at common law."  My argument was that it was a common

6    law tort in Oregon to burn down someone else's building.

7             As I understand, the only dispute between the

8    parties today is whether he had a property right in that

9    property.  And that if he did, it is a tort and the

10   destruction of that property should be compensated.

11            MR. DANIELSON:  A plaintiff cannot just say, I am

12   suing you under the law.  A plaintiff must give the

13   defendant some kind of notice about the -- about the

14   allegation that they are making.  He has alleged conversion.

15   They are stuck with conversion at this point unless they

16   amend the complaint.

17            THE COURT:  Anything else you want to argue?

18            MR. DANIELSON:  Nothing else except what I have

19   set forth in my briefs, Your Honor.

20            THE COURT:  Mr. Buchal, I am happy to hear what

21   you have to say.

22            MR. BUCHAL:  I will try and just touch the high

23   points.

24            The first argument -- is it all right if I sit,

25   Your Honor?

1           THE COURT:  It will help the court reporter.

2           Again, I am going back to the time line, and it

3    has a lot to do with notice, opportunity to be heard, final

4    orders, and I am -- I have walked through that trying to get

5    to when were -- when was your client given the opportunity

6    to contest the various actions.

7           MR. BUCHAL:  I believe the theory of the United

8    States is that he had an opportunity to contest by bringing

9    a civil suit against the forest service, and presumably he's

10   confronted with a course of conduct he regards as lawless,

11   and it's -- at some point along the way he could decide they

12   are really going to do it and so I better go to court and

13   get an injunction.

14          My theory of the case is that the law and the

15   design of the statutes that I'd like to talk about a little

16   does not impose upon citizens the burden to be the first to

17   get to federal court and sue.  And this is in a context

18   where it costs many, many thousands of dollars to go to

19   federal court and sue, and it's difficult.

20          And what happened in this case is Mr. Edgar had a

21   belief as to what was legal and not legal, and he

22   articulated that with painful precision up until the time

23   when he finally realized, and I believe there's an

24   allegation that one of the -- Ranger Schmidt's associates

25   told him, you know, that thing is coming down legally or

1   illegally.

2          And so then eventually he then capitulated and

3   said, fine, you know, he'd borrow the money, post the bond,

4   and get on with life.  And at that point Ranger Schmidt and

5   the others said, oh, well, you know, too late now.  We did

6   this little trick with personal property, and so now there's

7   nothing we can do, good-bye, and essentially burned it down.

8          But that, I think, is -- is the relevant part of

9   the facts rather than sort of the administrative appeals,

10  from my perspective.

11         If I could return to the *Bivens* argument, I think

12  the *Bivens* argument is sort of beside the point at some

13  level.  I would certainly recommend to Mr. Edgar that if the

14  court does what we ask the court to do and holds the United

15  States liable in damages, that we bifurcate this, find out

16  what the damages are in a trial that could last half a day,

17  and get this man an award that hopefully the United States

18  would pay, and then we would be done with the *Bivens* claim

19  and so forth and so on.

20         But if we don't do that, I think there's genuine

21  issues of material fact that bar resolution of the *Bivens*

22  claim.  As I said in my brief, we have gotten almost no

23  discovery from the government, not even her employment file.

24  Instead, we have this bald assertion that "It wasn't me."

25         In response to the "It wasn't me assertion," I

1    would say that there's a number of places in the record with

2    Ranger Schmidt's fingerprints on it.  But before I go

3    through that, I should say that the district ranger is the

4    master of her district.  If you look at 36 C.F.R. § 261.1a,

5    you will see that the district ranger has essentially

6    plenary authority to deal with people such as Mr. Edgar.  It

7    can take his proposals, it can approve anything, even if

8    it's illegal under the regulations, the Part 261

9    regulations, the ranger can, by her discretion, make it

10   legal.  The regulations afford her discretion to act, quote,

11   in the public interest; in the interest of the

12   administration of the service.  She has sort of unbounded

13   discretion to act with respect to Mr. Edgar, and this was

14   her decision at every step of the way.

15           With respect to the record evidence for that, we

16   have on the first page of the materials attached to my

17   declaration her own letter saying it's in the best interest

18   of the government to destroy the mine.

19           And I should say that that in itself raises a

20   triable issue of fact because the evidence shows that

21   there's another structure on this property that's been there

22   for decades and no one cares about that, no one insists on

23   destroying that, and this is really about sort of making a

24   test case.  But there's no public interest involved.

25           In April she tells him that the buildings are now

1    government property based on this faulty impoundment

2    process.  In May he tries to salvage them and says she won't

3    let him do that.  We -- we have her late on the eve of

4    destruction circulating a briefing paper to her staff saying

5    we have -- that he's come in, he's trying to post the bond.

6    We told him this wasn't an option, she says.  As late as

7    August of the summer it's destroyed.  She identifies herself

8    on a document that appears at Page 6 as the accountable

9    property officer and approves her staff members' plan to

10   destroy the buildings and provides what is barely legible

11   but appears to be a certificate for the completion of

12   cannibalization, abandonment, or destruction.

13        So the argument that she didn't do it is one that

14   I think is absolutely wrong, but at the least, there's a

15   genuine issue of material fact as to that.  And so -- so

16   there's an issue of fact as to her involvement.

17        The next argument he says besides the "We didn't

18   do it" is that he didn't have any property rights.  I will

19   come to that.

20        The next argument has to do with this large body

21   of law about *Bivens* actions, and while the United States --

22        THE COURT:  Excuse me.

23        MR. BUCHAL:  I am sorry, Your Honor.  This is

24   Mr. Edgar.  He is quite elderly and quite infirm and is

25   apparently late.  And if I might show him up here, if that's

1    all right.

2              THE COURT:  That's fine.

3              MR. BUCHAL:  I am sorry.

4              THE COURT:  Um-hmm.

5              MR. BUCHAL:  Come on up.  You are late.

6              THE COURT:  All right.  Mr. Buchal, is your client

7    able to hear?  Does he have hearing issues?

8              MR. BUCHAL:  He has very severe hearing issues.

9              THE COURT:  Perhaps Ms. Graham can get him our

10   hearing equipment.

11             THE CLERK:  Yes.

12             MR. BUCHAL:  Yes, Judge.  I have one of those.  It

13   worked really well.

14             THE COURT:  Can we have that?

15             THE CLERK:  Yes.

16             THE COURT:  And as a courtesy to the institution,

17   would you suggest to your client that he take his hat off?

18             Thank you.

19               (Counsel Conferred with the plaintiff.)

20             THE COURT:  We are off the record until we get the

21   hearing device.

22                         (Off record.)

23             THE COURT:  We are going to go back on the record.

24   Let's continue.  I just know that he was starting to be

25   disruptive, and my hope was that you would have a chance to

1   have a conversation with him so that he could have the

2   hearing and hear what's being said but not disrupt because

3   he couldn't hear.

4            MR. BUCHAL:  Yes.  That was a wise move by Your

5   Honor.  I am sorry the technology did not cooperate.

6            This -- it is his life.  He spent his life's work

7   building these things by hand and waited years for approvals

8   and so forth and so on, and so he has a very keen personal

9   interest, which may in fact be the only thing keeping him

10  alive at this point.  He's in very, very poor health.

11           But to return to the law.

12           THE COURT:  It's just another alert.  Go ahead.

13           MR. BUCHAL:  To return to the law, the next prong

14  that they argue is the *Wilkie*, the two elements for *Bivens*,

15  and the question is one of alternative remedy.  I will

16  freely admit that had Mr. Edgar had the money, he could have

17  at some point concluded that the government's threat to

18  violate the law was serious enough and sought an injunction

19  against unlawful behavior.  I do not believe that the

20  government has cited any case that imposes upon a citizen

21  the obligation to assume that the government will behave

22  unlawfully and to go to federal civil court first in order

23  to get the remedy.

24           I think that's inconsistent with nearly every case

25  that's out there.  I think that the cases that we have cited

1    say that when there is a completed wrong that has resulted

2    in damages that the APA is not an adequate remedy because

3    the APA is not a damages remedy, and at some level it's that

4    simple.

5          Now, the next -- the next item has to do with

6    qualified immunity or the policy prong of *Wilkie* as to

7    whether or not this is the kind of case in which there

8    should be such a right, and that goes to the question of how

9    clearly is this right established.

10         I would argue that rights of property are quite

11   fundamental and are quite well established, and so -- so

12   there's no -- it should have been obvious that what was

13   being destroyed here is a property right and that that was

14   not a proper thing to do.

15         And it should have been obvious not merely because

16   of the lack of explicit authority, but because if one looks

17   at the forest service's own manual and at things like the

18   definition of real property and personal property, one can

19   tell quite easily that this whole impoundment procedure,

20   there was something very seriously wrong with it.  And

21   indeed, we have cited a number of e-mails at the last minute

22   where law enforcement looks at this.

23         This impoundment regulation is listed as

24   assistance to law enforcement, and there was this

25   bureaucratic battle going on where the administrative arm

1    was saying, well, this is law enforcement; this isn't us.

2    The law enforcement officer says, wait a minute.  This is

3    real property.  This doesn't make any sense to us.  And

4    finally, a compromise is reached whereby the position is law

5    enforcement is going to stand there and watch while these

6    people do this thing because law enforcement in a sense knew

7    that this was wrong, and the rights that were being

8    violated, the federal law rights, were clearly established.

9            So it's not a case like *Goldfield*.  It's not a

10   case like *Brunskill*.

11           Your Honor asked an interesting question, which

12   was what was the opportunity to contest the trespass

13   finding.  And I wanted to emphasize that trespass is a

14   theory that did not exist when these events took place in

15   that form.  Trespass came up in the case of *United States v.*

16   *Tracy* based on events that happened afterwards and a case

17   that happened afterwards.  It is an unpublished opinion,

18   which is not to be followed as precedent, and we have

19   explained in some detail why we think that opinion is wrong.

20           And that is the subject to which I'd like to now

21   turn, which is the nature of the property rights that are

22   involved here.

23           It's a fuzzy sort of matter as to the nature of

24   the property rights, but it's not fuzzy in one sense, and

25   that is that the fundamental statutes, this 1872 mining law

1    that is codified in 30 United States, Sections 26 and 35

2    expressly refers to something that Congress called

3    possessory title.

4            Now, I know that the ultimate title to this

5    property resides in the United States.  But plaintiff has a

6    possessory title, and what the United States has is more of

7    a reversionary interest.  And there is sort of an evolving

8    area of federal law here where the United States is trying

9    to promote the theory that this possessory title is printed

10   out on, in some sense, toilet paper in the sense that it can

11   be ripped up by any number of means.

12           And it is the theory of the United States that

13   essentially noncompliance with any single regulation rips up

14   this possessory title and turns it into toilet paper.

15   That's not consistent with the statutes, and it's a rather

16   arcane statutory argument.  But the question -- because

17   those two statutes say that you are to comply with these

18   laws respecting possessory title, and what the United States

19   is -- it's pulling out the possessory title piece from the

20   comply with these laws and saying that, well, he didn't post

21   bond, he didn't remove it, he was in violation, poof the

22   title is gone.

23           I have cited the Supreme Court case of *Wilbur v.*

24   *United States*, which explains that how a miner keeps

25   everything in good standing is by complying with these

```
 1    mining law things for possessory title.
 2              And we see again and again an attempt to denigrate
 3    the strength of this title.
 4              Now, since I filed the briefs I had the
 5    opportunity to go over to the Lewis & Clark law library and
 6    look at the legislative history of the 1955 Multiple Use Act
 7    more precisely, and the reason I focused on this Multiple
 8    Use Act --
 9              THE COURT:  Okay.  I always like it, Mr. Buchal,
10    when you get knee-deep in your theory and then you talk
11    twice as fast as opposed to just as fast as you usually
12    talk, and Ms. Anderson is going to come unglued here in
13    about a minute, so I would ask you to slow down.
14              Thank you.
15              MR. BUCHAL:  Okay.  I will slow down.
16              The reason I thought it was very appropriate to
17    zero in on the Multiple Use Act is because if you look at
18    United States v. Shumway, in Shumway there was a dispute
19    between BLM and a miner, and the court, the Ninth Circuit
20    admonishes BLM that, wait a minute, this person is, I think
21    I quote, no mere social guest who can be shooed away.  And
22    the critical sentence is, quote, Pursuant to the Multiple
23    Use Act, the department must continue to coexist with a
24    holder of a valid claim whose right to possession has
25    vested.
```

1          And I want to focus on that word "vested" because,

2     again, it comes to the idea that this is a title, this is a

3     property, this is a species of something that's much

4     stronger than the cases they cite.  I didn't deal with one

5     of their cases in the briefing called *Paulina Lake*

6     *Association* where someone's cabin was destroyed, and you

7     read the case and you see it's done under a special use

8     permit.  And you see in the case a special use permit does

9     not create vested property rights.  And so that's the sort

10    of fundamental distinction here.

11         And as an agency charged to implement the laws of

12    the United States, the forest service needs to look at this

13    whole structure of property, and it needs to consider that

14    Congress has fashioned a property rights-based method of

15    accomplishing its goal of encouraging mineral development.

16         And when the forest service acts in an area where

17    there is no law, in an area of pure discretion, it needs to

18    consider, you know, is this something Congress really

19    intends us to do, to say every time a regulatory dispute

20    arises we can blow up a mine in 90 days if the owner doesn't

21    comply.

22         And we know from the plain language of the

23    Multiple Use Act that that's nothing like what Congress had

24    in mind.  What Congress had in mind is that the miner mines.

25    If he needs to cut down trees, he cuts down trees.  And

```
 1    whatever the forest service is doing is not allowed to
 2    materially or adversely affect the mining.
 3            And to return to the -- to the question of the
 4    legislative history, that language, this materially
 5    interfering with the mining was discussed at some length in
 6    the legislative history with the senate report saying:
 7            "This language, carefully developed,
 8         emphasizes the committee's insistence that this
 9         language not have the effect of modifying
10         long-standing essential rights springing from the
11         location of a mining site.  Dominant and primary
12         use of the locations hereafter made, as in the
13         past, would be vested first in the locater.  The
14         United States would be authorized to manage and
15         dispose of surface resources or to use the surface
16         for access to adjacent lands so long as and to the
17         extent that these activities do not endanger or
18         materially interfere with mining or related
19         operations or activities."
20            So I would submit, in light of that statutory
21    structure, it's beyond all cognizance that Congress would
22    anticipate that the service could essentially -- having shut
23    down the mine for ten years with an EIS or EA or whatever it
24    was and this process and that process, could then say, okay,
25    now we are going to destroy the mine unless you capitulate
```

1    to our demand within 90 days.  It's not anything that's

2    contemplated by Congress.

3           The authority on which the government acts is this

4    Organic Act.  And in particular, it's 16 U.S.C. 551.  That

5    statute is all about protecting the forests against what

6    they call destruction by fire or depredations.

7           And so yes, the forest service has a mission here.

8    It is to protect the forests against fire and depredations,

9    and that is what they are exercising their authority for.

10   But it's not a fire or a depredation to have some buildings

11   standing there while Mr. Edgar is trying to raise the money

12   for a bond and get -- get things together and get these

13   things developed.

14          There is no -- essentially no public purpose in

15   what is going on here.  The forest service has the authority

16   to make regulations under the Organic Act, but it has to do

17   that in light of all the purposes of statute, not just

18   because Ranger Schmidt doesn't like this cabin on the claim

19   but doesn't mind this other old cabin that's still sitting

20   on the claim.  It's just -- it is essentially the essence of

21   arbitrary conduct.

22          The other interesting feature of the Organic Act

23   that is almost -- is overlooked in every single court case I

24   have seen is a piece that appears in 472.  And 472 tells the

25   Secretary of Agriculture, and it's been amended many times

and some of the cross-references are slightly defective; you could write a whole memo on this, but it tells the forest service that it can go ahead and protect public lands and implement the laws of public lands, and then I will quote the pertinent part, "Excepting such laws as affect the surveying, prospecting, locating, appropriating, entering, relinquishing, reconveying, certifying, or patenting of any such lands."

        And so again, we see that there's a large body of law dealing with the miner's rights and this possessory title and the ability to enter the land and to conduct the mining, and that's -- that's not -- they are not allowed to mess around with the title.  If they want to destroy a miner's title, they can go to the Department of Interior. They can say, this isn't a real claim.  He's running a fishing camp.  He's running a brothel like *United States v. Rizzinelli*.

        Whatever he's doing, he's not doing the right thing, no valid claim, poof, he's dead.  They can come to the district court.  They can say what he's doing is unreasonable.  But these regulations themselves have to be executed in a way protective of the mining rights.

        So we finally come to the actual justification advanced.  The actual justification advanced is the impoundment regulations.  And I think Your Honor has picked

1   up on the notion that this is a regulation intended for lost

2   knapsacks and abandoned cars.  If you read the regulation,

3   the first sentence says that "Automobiles and other

4   vehicles, trailers, boats, camping equipment, and other

5   inanimate personal property on national forest lands without

6   the authorization of a forest officer which are not removed

7   within the time can be impounded," and so forth and so on.

8           It is obvious or it should be obvious to anyone

9   that this does not cover real estate.  And it's not just

10  that it's obvious because everybody knows from the first

11  year of law school the difference between personal property

12  and real property.  After all, some of the forest service

13  officials are not lawyers.  But if they open up their own

14  manual, the manual defines real property in painful detail

15  right to the point where if you cut the logs for the fence

16  and leave them on the ground it's personal property, and if

17  you put up the fence it's real property.

18          And that's all set forth in my declaration.  I

19  have quoted the parts of the manual.  And that language is

20  in the manual to assist officials in implementing these

21  things correctly.  And it may be that Ranger Schmidt got an

22  opinion from somewhere in Washington that real property is

23  personal property.  We don't know.  The opinion is in the

24  record.  But again, that's an issue of fact going to maybe a

25  potential defense to the *Bivens* claim or whatever.  It

1   doesn't make what this lawyer said in Washington correct.

2   He was not correct.

3           This whole impoundment thing is essentially a

4   search by the service for a trick, an illegal trick they can

5   use to deal with things they don't want for some reason

6   that it really doesn't appear in the record.

7           And Mr. Edgar understood that that trick was

8   illegal, and right up until the end he didn't really believe

9   they would do it because it was so obviously illegal, but

10  then having done it, the appropriate answer is that they

11  should compensate him for the loss of his property.

12          MR. DANIELSON:  I'd like to address just a few

13  points of that, Your Honor, in terms of the forest service

14  taking the structures down.  They were authorized under --

15  under the impoundment of personal property and also under

16  the -- the operating plan that was in effect at the time,

17  which states that -- it says:

18          "Upon termination of operations, sale, or

19          abandonment of claim, operator will remove from

20          the national forest land all equipment,

21          structures, and refuse that are not authorized by

22          this operating plan to encumber the mining claim

23          during periods when no mining is being conducted.

24          This action is to occur within 30 days of

25          abandonment or termination date."

1           That was a contract, an agreement that

2    Mr. Edgar -- Mr. Edgar entered into with the forest service.

3           THE COURT:  Assuming that the -- just let's assume

4    that the *Bivens* action stands.  What's the damages?

5    Assuming this action was illegal, the court finds it to be

6    illegal, what are the damages in this case?  How -- what's

7    the remedy?  Just -- don't argue with me whether I am right

8    or wrong about that, but just make the assumption that if

9    you -- the actions were found to be unlawful, what's the

10   remedy?

11          MR. DANIELSON:  Plaintiffs have claimed, I think,

12   approximately $200,000 in damage.

13          THE COURT:  What's your -- 200 -- how much is it?

14          MR. BUCHAL:  He had invested about 200,000.  We

15   have estimates of replacement costs in the record of around

16   three.  There's some issues as to whether or not there

17   are -- there is -- you know, there's potentially punitive

18   damages, things like that, but the raw economic part is

19   that.

20          MR. DANIELSON:  Do you want me to address any

21   other of Mr. Buchal's arguments?

22          THE COURT:  You know, the difficulty is that all

23   this would have been -- I understand both sides of this

24   pretty well, and the difficulty is had anyone filed a show

25   cause order and brought this into court, we would have had a

1   much shorter duration and addressed all these issues ahead

2   of time and an opportunity to be heard and responded, and I

3   think maybe form over substance, but that was a shortcut.

4   That choices were made about how to proceed to action in a

5   way that I think there are questions of fact and there

6   are -- there's an analysis here that I think is something

7   that I am not necessarily comfortable resolving this case at

8   this juncture.

9          So I am giving you a heads-up that I think I -- I

10  mean, I think the issues in this case are more complex than

11  perhaps the government is looking at and considering and

12  actions taken that are in dispute that I don't believe I can

13  resolve this at this particular time.

14         And at the same juncture, I think there's an

15  intertwining of various statutory schemes and expectations,

16  and I think -- I am going to run down and look -- run down

17  the analysis of all of it.

18         So I am going to suggest that how people choose to

19  go forward in the future, you need to look at the enormous

20  amount of time we are going to spend on this matter in

21  federal court when basically giving notice and an

22  opportunity to be heard at every stage and every proceeding

23  might have moved this case in a way that -- to decision.  I

24  mean, it seems to me there's no "time is of the essence" in

25  this particular conclusion how this case came to closure.

1    There was plenty of time and plenty of notice to walk

2    through all the procedures and all the stages, and I think

3    that -- the message I want back is people need to look at

4    when there's a complexity of these various rights and

5    responsibilities that they be followed down to the end

6    because I can't -- how could this individual have had notice

7    to contest some of the fundamental actions that were taken

8    in this particular case with how, frankly, it was handled?

9         I mean, I am going back to all of it.  I think the

10   issues raised on the distinction that the Congress and the

11   statutory scheme that the Congress put in place for mining

12   claims has to be looked at as intersecting with what are the

13   obligations to the forest service, BLM, how those work, and

14   those distinct rights.

15        I mean, I understand the argument you made about

16   the possessory title and how that's being looked at how --

17   as a different creature.  So I understand that.

18        So I am still thinking through the analysis

19   because this is -- this is a very interesting case in terms

20   of how those come together, and it has more to do with how

21   do I -- if I am going to have to write something or proceed

22   in this case, how we look at it broadly.  And I am telling

23   you, that's how I am looking at this, how these all come

24   together, because this is not going to be the first and only

25   time I have had somebody who has had a long-standing claim

1    that is -- has had a pattern of how they have worked it --

2    with -- or -- with how they have worked through the system

3    and then things change and there's a need to be heard, a

4    need to address those.  Whether we like it or not, you know,

5    that's about the process, and I am concerned about it in

6    this particular case.

7           So I -- you know, I came in here with my time line

8    of when things happened, why they happened, who made

9    decisions, when, what were people's opportunities to be

10   heard, opportunities to contest, and it seems to me that

11   there were some easy steps that could have been taken where

12   closure in this case would have happened without it coming

13   into federal court in this posture.

14           MR. BUCHAL:  May I make a couple of remarks, Your

15   Honor?

16           THE COURT:  Sure.

17           MR. BUCHAL:  I certainly agree with Your Honor

18   that the *Bivens* issues are extraordinarily complex and at

19   this juncture can be disposed of with the notion that

20   there's issues of fact, but as to the fundamental question

21   of whether the government violated a property right, it

22   seems to me that the facts are not at issue.  It acted

23   pursuant to a regulation that plainly did not apply.  And if

24   it wanted to get rid of Mr. Edgar, it could have done what

25   they have done for a hundred years and come into court with

1   a show cause.

2           And so I think that we have no hope of, frankly,

3   settling the case unless Your Honor would enter a ruling

4   holding the United States liable and putting the other piece

5   aside and then we might try.

6           THE COURT:  I hear you.  I guess I am stating --

7   what I am stating on the record is that I am wrestling with

8   those issues and I understand them.  And I am, in many ways,

9   giving a heads-up that I have discomfort with how this case

10  was -- proceeded.  And I am perfectly prepared -- it depends

11  on how much I am going to have to write, but if I am going

12  to write, I am not writing for this case.  I am writing

13  something more comprehensive.  And it may be at this

14  juncture, it's simply -- there's, you know, facts that

15  cannot be conclusive.  I don't know if I am prepared to go

16  that far.

17          But I am going to suggest to you that sometimes,

18  you know, the hardest cases make the worst law.

19          So I think in looking all the way around this,

20  why -- I mean, I have had cases with, I would say, longtime

21  miners who were not necessarily, shall we say, getting with

22  the program on the new ways in which the forests are

23  managed, and they are show caused in here and I have

24  hearings to move them to the fact they don't have any

25  choices.  And it's too bad that didn't happen in this case

1   because we have been -- it's been -- we have been able to

2   work the process and people being heard, decisions being

3   made, people in authority making decisions that support what

4   needs to occur or to have the people making the decisions

5   see it a little differently under the way in which we have

6   to -- it's the role we play.  And now we are having to

7   look -- armchair quarterback, so to speak, decisions that

8   were made that -- that put in conflict rights and

9   obligations, in my view, because there are different ways in

10  which the statutes fit together because of the different --

11  the mining, the forest, the use, and that some of this is in

12  transition.

13          So anything else you want to add?

14          MR. DANIELSON:  The last point I would make, Your

15  Honor, is that Mr. Buchal argues that because Ms. Schmidt

16  was in a position of authority, she should be held liable,

17  and clearly under *Bivens* there is no vicarious liability,

18  and that she must -- that plaintiff must show she took some

19  action herself to violate the constitutional rights of the

20  plaintiff, and here she increased the bond amount.  That's

21  the only action she took.

22          THE COURT:  That's the position you are taking.  I

23  don't know that I agree with that, but I am going to do my

24  work.

25          Now, I am going to suggest to you that you ought

```
1    to go back and talk to Judge Coffin again about resolving

2    this case because it's going to -- the amount of resources

3    expended on resolving this case through the next stages,

4    because it's not just going to go away at this point, are

5    going to cost everybody a great deal of time and money.  And

6    I have read this -- I have went through this, and there are

7    any number of places -- I was just surprised, you know, why

8    didn't people come to court and ask for --

9               MR. BUCHAL:  But isn't the ultimate question who

10   should have done that?  I mean, if --

11              THE COURT:  I understand.  You don't need to argue

12   again.

13              MR. BUCHAL:  Okay.  All right.

14              THE COURT:  I understand how I generally see these

15   cases.  A lot of times lawyers fly in from DC, and I see

16   them, that's when I see them, and we are in here on a show

17   cause.  I think that's what generally -- historically that's

18   what we anticipate.  So something is different here.  So

19   because it is different, I am going to take the time to look

20   all the way back through this.  So the issue becomes if I

21   find that there is a mistake made, was a mistake made,

22   what's the remedy, what's -- you know, how do we address

23   that, you know, all of that.  Okay?

24              Anything else?  Anything else anybody needs to

25   add?  Anything else they want me to look at?
```

1    MR. DANIELSON:  I have one last thing, Your Honor.

2    I have not consulted with the forest service, so I am just

3    making this suggestion on my own.  If you are encouraging us

4    to go to mediation, I don't want the court to expend your

5    time if it's unnecessary.  Perhaps give us a period of time

6    to decide whether we should go back to mediation.

7    THE COURT:  I know that there is such a -- it has

8    to go to stage after stage after stage to get authority and

9    all that, and I know that Judge Coffin, because I have

10   worked with him for 13 years here, at the end of his

11   mediation, even when they say, "We are not here to settle

12   and we are not" -- "we are too far apart," he always says,

13   "I am available; call me if I can help."

14   So this -- we will keep moving and doing our work,

15   and he stands, frankly, because after I read everything, we

16   double-checked with him, are you around today because I

17   think people ought to talk to you today, and unfortunately

18   he's in a complex case that I am well aware of, and I

19   wouldn't want to see him distracted from it.  But I think

20   your clients need to take a look at how to analyze, and if

21   they need something in writing from us, it will take a

22   little bit to get something done because I am going to do

23   the research and the thorough research.

24   And I happen to think that legislative history

25   does matter and all that, you know, so we'll run down all

```
1    those issues as we need to, and we may not need to, but --

2              MR. DANIELSON:  Excuse me.

3              THE COURT:  -- this case does concern me.  The

4    process does concern me, and that's -- that's what I see a

5    problem here, so --

6              MR. DANIELSON:  Excuse me, Judge.  Would you like

7    to give us a date to -- a time line or deadline to go back

8    to mediation before you start working on an opinion?

9              THE COURT:  Do you want a couple of weeks?

10             MR. DANIELSON:  Sure.  Yes.

11             THE COURT:  It won't stop us from working on it.

12   We keep working on it because we -- you know, we have a --

13   we'd rather go up than down.  We'd rather say we did all the

14   work and we are not going to need to use it.  We don't just

15   put things off.  We keep going, but we may not issue it

16   until we are told you need it.  Okay?  Because again,

17   sometimes hard cases make tough law.  Okay?

18             Anything else?  So does that make sense in terms

19   of his time line?  Did you check with him?  Couple weeks?

20             (The court conferred with the law clerk.)

21             THE COURT:  I think you guys need to make your

22   decision about what you choose to do, and that's fine.  Make

23   contact with his CRD or through Ms. Graham in our chambers

24   if you want a date.  And if that's the case, once you get a

25   date certain with Judge Coffin, let her know, and then I
```

1   will just assume, if I get that information, the information

2   is hold your opinion until then or if you need -- you both

3   need it, I will do it.  I just, frankly, think going into

4   mediation at this point will be helpful to everybody.

5   Should be.

6           So do you need a couple weeks?  Tell me how much

7   time you need to talk with all your people.

8           MR. DANIELSON:  I think two weeks would be fine,

9   Judge.

10          THE COURT:  All right.  And just circle back and

11  let us know because -- you know, what you are going to do.

12  I would appreciate that.  You know, I just -- you know,

13  living in this state a long time, you need to understand, we

14  understand the forest service leases, we understand cabins,

15  we understand obligations to -- regulations that change.

16  They change with different administrations, different

17  processes, all that.  And when you have long-standing --

18  obviously a long-standing individual who has had a claim on

19  there for a long time, the process matters.  How we get to

20  the decisions that we make in institutions with changes

21  matter.  And maybe people didn't move accordingly, but it's

22  why we have all these processes because at the end of the

23  day when we take action, and I would say -- just -- I have

24  to say on the record, when you know that somebody has hand

25  built a piece of important family historical -- his life's

1    work, hand done, it may look not like art to us, but it may

2    be art and important to him, we ought to stop and take the

3    chance to do the process all the way to the end so we have

4    no regrets under the terms of what process is about.

5         And I am just disapp -- I think in this case there

6    was a shortcut, maybe, taken that shouldn't have happened,

7    and I don't want that to happen down the road to anybody

8    else, frankly, and that there's no way that time wouldn't

9    have worked this thing out if people had taken the steps

10   that we expect people to take in terms of moving forward on

11   process.  It drives everything.  I mean, I am in Eugene,

12   Oregon.  Processes are extracurricular activity, it would

13   seem; in other places, not so much.

14        But there's a balance between walking through a

15   process, and at the end of the day, somebody had every

16   single possible way to make a final decision before that

17   dramatic action was taken.  That's a dramatic action in this

18   court's opinion when, again, there were other ways it could

19   have gone down a process.

20        And I would be in the courtroom in a different

21   posture with Mr. Edgar saying to him they gave you every

22   single chance.  I will give you -- here's the last chance,

23   and if you don't meet it, because they have done their

24   process, they have got a court order that blesses what they

25   have done.  You didn't take that extra step, and I think

 1    that's what's -- in this instance, I think that's what was

 2    contemplated when you look at the mixture of the statutes.

 3    And maybe it was more cumbersome and maybe it wasn't that

 4    clear or maybe people made assumptions about it, but I think

 5    always coming in and asking us to help sort that out is not

 6    a bad strategy.

 7             Mr. Buchal has had any number of times where we

 8    have had to say to him, they are right.  Your client needs

 9    to do X.

10             Am I not correct about that?

11             MR. BUCHAL:  Yes.

12             THE COURT:  Right.  And that's just the way the

13    cases come in.

14             So I am going to suggest -- I am saying more on

15    this particular case because I think I want you to know that

16    for us on the bench that process does matter and we look all

17    the way down it.  And whether -- it's always better

18    sometimes to come and ask permission than forgiveness.

19             That's all.  Thank you.

20             MR. BUCHAL:  Thank you, Your Honor.

21             MR. DANIELSON:  Thank you, Judge.

22             THE CLERK:  Court is adjourned.

23             *(The proceedings were concluded this*

24             *22nd day of June, 2011.)*

25

38

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 30th day of December, 2011.

5

6     /s/Kristi L. Anderson

7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25